UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEI-HRENG HOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-cv-3584 |
| | § | |
| CHING-WU "PAUL" CHU, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Pei-Hreng Hor's ("Plaintiff") Motion to Compel Discovery. (Doc. No. 84.) Having considered the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Plaintiff's Motion to Compel Discovery should be granted in part and denied in part.

**I.    BACKGROUND**

This cases arises out of a dispute over rightful inventorship of U.S. Patent Nos. 7,056,866 ("the '866 Patent") and 7,709,418 ("the '418 Patent") (collectively "patents-in-suit"). The patents-in-suit involve superconducting compositions with transition temperatures higher than the boiling point of liquid nitrogen (approximately 77° Kelvin).[1]

Ching-Wu "Paul" Chu ("Defendant" or "Chu") is listed as the sole inventor on both the patents-in-suit. Pei-Herng Hor ("Plaintiff" or "Hor") filed the present suit to correct inventorship, alleging that he was a joint inventor of the scientific advancements that are the basis of the patents-in-suit. (Doc. No. 1.) Additionally, in March 2010, the Court granted a Motion to Intervene by Ruling Meng ("Intervenor" or "Meng") who also claims joint inventorship of the patents-in-suit. (Doc. No. 27A.)

---

[1] The facts are undisputed except where indicated.

1

The superconducting compositions underlying the patents-in-suit were conceived of in the mid-1980s when Chu, Hor, and Meng worked together in Chu's physics research group on superconductivity at the University of Houston ("UH"). In 1987, Hor, Meng, and Chu met with one of UH's patent attorneys, Charles Cox, to discuss the scientists' respective contributions to the superconductor discoveries in anticipation of filing patent applications. At the meeting, Chu allegedly suggested that Hor and Meng should also be included as inventors on the patent applications. In response, Cox stated, "Not everyone can be an inventor. A pair of hands cannot be considered an inventor." (Doc. No. 94-3.) According to Hor, he was disturbed by Cox's comment and so he stood up and walked out of the room. Hor alleges that Chu followed him outside, apologized, and said, "I am sorry. This lawyer does not know anything about our group. I will go back to tell him and straighten things out." (*Id.*)

The application for the '866 Patent, which was filed in 1987, listed Chu as the sole inventor. (Doc. No. 84-3.) The application for the '418 Patent was filed in 1989 and also identified Chu as the sole inventor. (Doc. No. 84-4.) Both applications assigned any resulting patents to UH. Although Cox was retained by UH, Chu executed a Declaration and Power of Attorney appointing Cox as one of the attorneys authorized to represent him during the prosecution of the patents-in-suit. (Doc. Nos. 84-5 & 84-6.)

In 1990, the University of Alabama initiated an interference proceeding ("Wu Interference") to contest priority of invention and inventorship of the patents-in-suit. Cox represented Chu in the Wu Interference. In 1999, Chu ultimately prevailed before the USPTO Board of Patent Appeals and Interferences, which awarded him priority of the

patent application. The University of Alabama appealed that decision to Federal District Court. The suit was dismissed in 2000.

In January of 2006, nearly twenty years after the filing of the first patent application, Plaintiff and Meng approached UH officials to inquire about their inventor status in relation to the patents-in-suit. Plaintiff and Meng allege that, in January 2006, they learned for the first time from John Warren, the Vice Chancellor for Intellectual Property Management, that they were not included as inventors on the applications for the patents-in-suit. On February 1, 2006, while both patents-in-suit were still pending before the PTO, Plaintiff and Meng met with UH outside counsel Lester Hewitt and other UH officials to discuss their claims to inventorship. As a result, on February 21, 2006, counsel for UH and Chu filed an Information Disclosure Statement ("IDS") with the PTO, which included copies of letters from Lester Hewitt to Hor and Meng concerning their inventorship claims. The PTO subsequently granted Defendant's Petition to Suspend the Rules, which postponed the issuance of the '866 patent for a period of one month while UH investigated Plaintiff and Meng's claims. On March 14, 2006, during another meeting regarding their inventorship claims, Plaintiff and Meng presented affidavits to UH officials. The affidavits described each scientist's involvement in the development of the inventions underlying the patents-in-suit. Plaintiff's affidavit also included a description of the portion of the 1987 meeting where Cox allegedly stated that "[a] pair of hands cannot be considered an inventor." The next day, on March 15, 2006, Defendant filed an additional IDS in the prosecution of the patents-in-suit, which contained Hor's and Meng's affidavits in their entirety. The '866 Patent issued shortly thereafter on June 6, 2006.

Hor filed an administrative grievance with UH in order to resolve the dispute over inventorship. After that effort proved unsuccessful, Plaintiff filed the present action to correct inventorship on December 5, 2008. In November of 2009, Plaintiff served Defendant with his First Request for Production and First Set of Interrogatories. Plaintiff's requests included numerous documents related to inventorship, the Wu Interference, and communications among Hor, Meng, Chu, and any patent attorneys relating to the patents-in-suit. In response to several of Plaintiff's discovery requests, Defendant asserted the attorney-client privilege and/or work product protection. Defendant also testified in his deposition on June 16 and 17, 2010 about the portion of the 1987 discussion among Plaintiff, Defendant, Meng, and Cox that Plaintiff included in the affidavit disclosed to the PTO. Defendant, however, refused to testify when questioned about other communications with Cox regarding inventorship, asserting the attorney-client privilege.

On September 16, 2010, Plaintiff filed a Motion to Compel Discovery in which Intervenor Meng has joined. (Doc. No. 84.) Plaintiff argues that Defendant voluntarily waived the attorney-client privilege with regard to documents and communications related to the subject matter of inventorship when he disclosed Cox's confidential communication to the PTO during the prosecution of the patents-in-suit. As a result, Plaintiff contends that Defendant should be compelled to produce all documents related to inventorship from 1987 to the present regardless of whether they would otherwise be privileged. Plaintiff also argues that Defendant again waived the attorney-client privilege with respect to Cox's statement in the context of this lawsuit by relying on it to defend his status as the only inventor named in the patents-in-suit. Defendant counters that he

4

has never relied on Cox's statement for its truth (that Hor and Meng were simply a pair of hands) and that he would be unfairly prejudiced if the waiver rendered discoverable all communications regarding inventorship over a more than twenty year period.

## II.     LEGAL STANDARD

Rule 26 of the Federal Rules of Civil Procedure provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

FED. R. CIV. P. 26(b)(1). The broad scope of permissible discovery is constrained by the attorney work product doctrine and any relevant privileges, including the attorney-client privilege. *See* Fed. R. Civ. P. 26(b)(1),(3). Questions of privilege that arise in the course of adjudication of federal rights are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." *United States v. Zolin*, 491 U.S. 554, 562 (1989) (citing FED. R. EVID. 501). The present case is one to correct inventorship of a patent under 35 U.S.C. § 256, and therefore, the Federal Circuit has exclusive jurisdiction of an appeal from a final decision of this Court. The Federal Circuit applies its own law when deciding whether materials are discoverable in a patent case if the materials relate to an issue of substantive law. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803 (Fed. Cir. 2000). The parties agree that Federal Circuit law governs the questions presented here because the relevant disclosure took place in a patent-law specific context. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d at 803 (finding that Federal Circuit law applied because determination of the attorney-client privilege to invention record clearly implicated

5

substantive patent issues); *In re Echostar Commc'ns Corp.*, 448 F.3d 1294 (Fed Cir. 2006) (applying Federal Circuit law to determine the extent to which a party waives attorney-client privilege by asserting the advice of counsel to defend a charge of willful patent infringement).

The attorney-client privilege protects the confidentiality of communications between attorney and client made for the purposes of obtaining legal advice. *American Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745 (Fed. Cir. 1987). This privilege is "recognize[d] in order to promote full and frank communication between a client and his attorney so that the client can make well-informed legal decisions and conform his activities to the law." *In re Echo Star Commc'ns Corp.*, 448 F.3d at 1300-1301.

The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects from disclosure documents and tangible things prepared by a party or his representative in anticipation of litigation. *Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1580 (Fed. Cir. 1985). The work product protection is intended to promote a fair and efficient adversarial system by protecting "the attorney's thought processes and legal recommendations" from the prying eyes of his or her opponent. *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997) (citations omitted). Despite the important objectives served by the work product protection and the attorney-client privilege, in determining whether disclosure of privileged communications is required, the burden of persuasion rests on the party claiming the privilege. *See Fisher v. United States*, 425 U.S. 391, 402-03 (1976).

Indeed, the attorney-client privilege and work product protection are not absolute. Protection for attorney work product may be waived by disclosure or by other conduct,

such as the testimonial use of the materials. *United States v. Nobles*, 422 U.S. 225, 239-240 (1975). Similarly, a party "can waive the attorney-client privilege when, for instance, it discloses an attorney's advice to establish a defense." *In re Echo Star Commc'ns Corp.*, 448 F.3d at 1301. Disclosure of an attorney-client privileged communication does not lead to a wholesale waiver of the attorney-client privilege, but in order to prevent unfair selective disclosure, the Federal Circuit has recognized that, when a party waives privilege as to a particular communication, the waiver applies to all other communications relating to the same subject matter. *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005). "The overarching goal of a waiver in such a case is to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege as to unfavorable advice." *In re Echo Star Commc'ns Corp.*, 448 F.3d at 1303.

Determining the appropriate subject matter of a privilege waiver has been described as a highly fact-intensive inquiry. *See e.g., In re Keeper of the Records XYZ Corp.*, 348 F.3d 16, 23 (1st Cir. 2003). Indeed, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Fort James*, 412 F.3d at 1349-1350. In patent cases, the extent of waiver is generally narrowly construed. *See e.g.*, *Mass Engineering Design v. Ergotron*, *Inc.*, No. 206 CV 272, 2008 WL 744705, at *1 (E.D. Tex. Mar. 19, 2008). Similarly, a waiver of the work product protection extends

to factual, or non-opinion, work product concerning the same subject matter as that of the disclosed work-product. *In re Echo Star Commc'ns Corp.*, 448 F.3d at 1301.[2]

The temporal scope of a waiver is generally limited to the period when the disclosing party placed the privileged material at issue. *See Windbond Electronics Corp. v. Int'l Trade Commn'n*, 262 F.3d 1363, 1375-1376 (Fed. Cir. 2001). If waiver of the privilege is renewed beyond the initial disclosure, the temporal scope of the waiver may be extended accordingly. *Id.*

### III.  ANALYSIS

The Court must delineate the scope of Defendant's waiver as to both the subject matter and the time period covered. The Court will consider each issue in turn.

#### A.  Subject Matter Scope

It is undisputed that Defendant submitted affidavits executed by Plaintiff Hor and Intervenor Meng to the PTO during the prosecution of the patents-in-suit. Defendant acknowledges that Plaintiff's affidavit contained patent attorney Cox's "pair of hands" statement. The parties do not dispute that Cox's statement implied his opinion that Hor and Meng were not co-inventors of the superconductor discoveries. Nor do they dispute that Defendant has relied upon the statement to defend the current suit to correct inventorship. As discussed *infra*, they disagree, however, about the manner in which Defendant has used the statement.

---

[2] The parties' briefs do not clearly distinguish between attorney-client privilege and work product protection as they relate to the issue of subject matter waiver. The work product doctrine and the attorney-client privilege are related but distinct "privileges." *Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir. 1990). Indeed, although the attorney-client privilege evaporates upon any voluntary disclosure of confidential information to a third party; the purpose of the work product privilege is not in all cases frustrated by a similar disclosure. *See United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1298 (D.C. Cir. 1980). Given the substantial overlap between the two privileges, the Court will restrict its analysis to the attorney-client privilege with the understanding that it applies, where relevant, to work product protection as well.

By voluntarily disclosing this communication to third-parties – first the PTO, and now, this Court – the Court finds that Defendant waived the attorney-client privilege with respect to Cox's statement. The issue at the heart of this motion is rather the appropriate subject matter of the waiver created by Defendant's disclosures.

Plaintiff argues that, as a result of the disclosure of this single statement, Defendant should be required to produce *all* attorney-client privileged documents relating to the subject matter of "inventorship." Defendant counters that the scope of the waiver should not be so broadly construed. Indeed, Defendant contends that he did not rely on the statement during the PTO prosecution and has not relied on Cox's statement for its truth in the current litigation, but only to show that Plaintiff and Meng knew in 1987 that they were not listed as inventors on the patent applications. Thus, he argues the waiver should be limited to the document containing the communication or, in the alternative, should extend only to attorney-client communications regarding the issue of Plaintiff and Meng's notice.

To support an expansive subject matter definition, Plaintiff broadly characterizes Cox's statement implying that Hor and Meng were merely "a pair of hands" as legal advice relating to "inventorship." He claims that Defendant did not redact Cox's statement regarding Plaintiff and Meng's limited role in the invention, but instead, submitted the complete affidavits to the PTO "in order to secure ownership of an enforceable patent on behalf of UH." Plaintiff claims that by waiving attorney-client privilege in order to gain an advantage in prosecuting the patent, Defendant cannot now prevent the discovery of other documents related to attorney-client communications about inventorship. Allowing further discovery of communications related to the same subject

9

matter, Plaintiff argues, is intended to prevent a party from selectively choosing to disclose information to its advantage and later withholding information that might be to its disadvantage. Plaintiff argues that Defendant has used the attorney-client privilege unfairly, as both a sword and a shield. Indeed, Plaintiff contends that "having voluntarily produced documents to the PTO containing the advice of counsel on inventorship and relying on the same documents and advice now to defend why he is the only inventor named in the patents-in-suit and to support Chu's Motion to Dismiss," Chu cannot shield other documents related to inventorship by asserting attorney-client privilege.

Plaintiff cites two cases to support his broad definition of the subject matter of Defendant's attorney-client privilege waiver. *See Windbond Electronics Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363 (Fed Cir. 2001); *The Bd. Of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys. Inc.*, 237 F.RD. 618, 623 (N.D. Cal. 2006).

These cases, however, present facts that diverge sharply from the circumstances of Defendant's disclosures. In *Windbond*, a patentee sought to enforce three patents against a group of companies for importing and/or selling infringing products in the United States. 262 F.3d at 1368. During the course of the infringement proceedings, the International Trade Commission ("ITC") determined that the patents were defective (and therefore unenforceable against the alleged infringers) because they failed properly to list all inventors. *Id*. Following the ITC's decision, the patentee affirmatively petitioned the PTO to correct inventorship of the patents. *Id*. at 1368-69. To obtain the certificate of correction, the patentee relied heavily on the additional inventor's declaration, which contained the advice of counsel he received regarding inventorship. *Id*. at 1375. The patentee then used the certificate of correction to convince the ITC to reconsider the

10

enforceability of the patents in the context of a renewed infringement prosecution. *Id*. at 1369. The alleged infringers defended the action, in part, on the grounds that the patents were invalid due to incorrect inventorship and/or inequitable conduct committed during their prosecution. *Id*. at 1370-1375. When the defendants sought to discover other attorney-client communications related to inventorship, the ITC found that "[the patentee] placed at issue the advice of counsel by its affirmative act of petitioning the [ITC] for reconsideration of the inventorship issue based on a certificate of correction of the [patent] issued by the PTO." *Id*. at 1369. Thus, the ITC concluded that the patentee "waived its attorney-client privilege and work product protections for all documents concerning the [patent's] inventors." *Id*. The Federal Circuit affirmed.

Similarly, in *Board of Trustees*, the patentee initially omitted the names of two original co-inventors when it filed the relevant patent applications. 237 F.RD. at 620. When the patentee sought to correct the errors in order to avoid claims of patent invalidityit submitted evidence, as required, to demonstrate the omission was through error rather than deceptive intent. *Id*. The declarations the patentee submitted to demonstrate its good faith reliance on legal advice contained attorney-client communications about the issue of inventorship. *Id*. at 620-21. After obtaining a certificate of correction, the patentee sought to enforce the patents against an alleged infringer. *Id*. at 620. The alleged infringer sought discovery of other attorney-client communications related to inventorship in order to support its defense that the patentee failed to disclose the collaboration between the patentee and the alleged infringer and the alleged infringer's inventive contributions to the subject matter of the relevant patent. *Id*. at 621. Thus, the trial court found that "[the patentee] disclosed the contents of

11

privileged attorney-client communications and work-product protection to the PTO to successfully obtain ownership of the contested patents and cannot now attempt to shield all other communications on the same subject matter as this would unfairly prejudice" the defendant. *Id*. at 625.

Plaintiff claims that Defendant's waiver and the nature of the legal advice in this case are "no different" from the facts presented in *Windbond* and *Board of Trustees*. He argues that Cox's statement constituted legal advice that Plaintiff and Meng were merely a "pair of hands," suggesting that neither was a co-inventor. Because Defendant chose to submit this advice to PTO (rather than redacting it) "in order to secure the patent," he similarly waived the entire subject matter of "inventorship."

Although the cases Plaintiff discusses appear superficially similar to the facts presented here, in that they also involve a submission of attorney-client communications to the PTO, Defendant persuasively argues that the instant case presents critical factual distinctions. Indeed, the circumstances under which the disclosure was made, the context of the legal advice, and the prejudice to the parties diverge significantly.

First, unlike the cases Plaintiff cites, Defendant submitted Plaintiff and Meng's affidavits as part of an IDS during the initial patent prosecution, not during a subsequent affirmative petition to obtain a certificate of correction. The patentees in *Windbond* and *Board of Trustees*, on the other hand, submitted and relied upon the privileged communications because they were necessary to establish a lack of deceptive intent, a prerequisite for correcting the inventorship errors that rendered their patents unenforceable. The disclosures allowed the patentees to obtain certificates of correction, which they then used to enforce the patents against alleged infringers. In defining a

12

broad subject matter, the courts considered the affirmative nature of the patentees' inventorship arguments before the PTO in concluding that the patentees had used the communications as a sword.

By contrast, Chu was *required* to disclose Plaintiff and Meng's affidavits to the PTO because the patent applications were still pending at the time Plaintiff and Meng contested inventorship with UH. Under 37 C.F.R. § 156, a patent applicant has the duty to disclose to the PTO information material to patentability, including third-party claims of inventorship. Thus, unlike the *Windbond* and *Board of Trustees* patentees, Defendant did not rely on the substance of Cox's statement in order to *obtain* the patent. Rather, *Plaintiff* chose to include the statement in his affidavit to support his claim of inventorship. This information was adverse to Defendant's patent applications, but he disclosed the affidavit in order to comply with the law. Further, the evidence suggests that neither Defendant nor the PTO Examiner relied on the affidavits or Cox's statement in prosecuting the patents. Thus, inventorship was not placed "at issue" in the prosecution of the patents-in-suit as in the cases Plaintiff cites.

Second, in defining "inventorship" as the proper scope of the waiver, the courts in *Windbond* and *Board of Trustees* considered the patentee's posture as plaintiffs prosecuting patent infringement suits. Certainly, as the Federal Circuit's test instructs, the *Board of Trustees* court was concerned about prejudice to the defendants that would result if they were not afforded access to the full scope of the patentee's attorney-client communications regarding inventorship. The defendants sought the production of the privileged documents in order to defend themselves against the plaintiffs' suits by demonstrating the patents' invalidity due to incorrect inventorship and/or inequitable

conduct. Possessing the full range of the legal advice plaintiff received on the subject of inventorship, not just that which was selectively disclosed to the PTO, was critical to the defendants' ability to defend the patentee's lawsuits. Indeed, the *Board of Trustees* court noted that "the declarations were submitted to the PTO in order to correct authorship and ensure [patentee's] ownership of enforceable patents, which are now asserted against [the defendant]. Since [the defendant] stands to suffer significant legal harm if it is found to infringe on those patents, it is disingenuous for [patentee] to conclude that [the defendant] has suffered no prejudice." *Id*.

Unlike the patentees in *Windbond* and *Board of Trustees*, Chu is the *defendant* in the present lawsuit. This changes the balance of prejudice significantly. Defendant did not attempt to gain a legal advantage, which he then used against Plaintiff. Rather, Plaintiff has brought suit to force the correction of Defendant's patent. Under these circumstances, it is Defendant that would be unfairly prejudiced by being ordered to disclose all documents related to the ultimate issue in this suit – inventorship.

Indeed, courts generally extend the waiver beyond those communications initially disclosed only if the disclosing party sought an advantage in disclosing one set of privileged documents while hiding another that could potentially contradict the initial set. Notably, Defendant did not seek to argue that Chu was the only inventor by submitting Plaintiff's affidavit to the PTO; he intended only to comply with its disclosure requirements by submitting third-party claims to inventorship. Thus, although Cox's statement is superficially about whether Plaintiff and Meng were inventors, Defendant did not disclose the communication in order to *establish* inventorship like the patentees *Windbond* and *Board of Trustees*.

The law instructs the Court to consider the context in which the disclosure was made and the manner in which it is employed. Indeed, the underlying purpose of forcing waiver of all documents related to the same subject matter is to prevent a party from selectively disclosing confidential communications that support its position, while shielding the rest, which may be unfavorable, from its adversary. Where, as here, Defendant has not used the communication to gain an advantage by placing inventorship at issue, this motivating concern for fairness is not implicated. Thus, the Court finds that Defendant's submission of Plaintiff's un-redacted affidavit containing Cox's statement should not waive all communications related to the subject of inventorship. As explained *infra*, however, the Court believes a narrower waiver has occurred in the context of this litigation.

Plaintiff argues that, even if Defendant did not place Cox's statement at issue in the PTO prosecution, Defendant has used the statement in the context of this lawsuit to "defend that Chu is the only inventor of the patents-in-suit." Thus, Plaintiff argues, Defendant has used the Cox statement as a sword to gain advantage in the present litigation. Defendant admits he has referred to Cox's statement in his Motions to Dismiss (Doc. Nos. 66 & 68.) He refutes, however, Plaintiff's characterization of the manner in which he employed the statement. Rather than relying on the statement in order to establish Chu's sole inventorship as a legal concept, Defendant claims he cited the statement only to demonstrate that Plaintiff and Meng should have been on notice in 1987 that they were not included as inventors on the patent applications. A review of Defendant's briefing reveals that he has indeed limited his use of Cox's statement to the issue of notice. Again, the Federal Circuit's test instructs the Court to consider the

circumstances of the disclosure and the nature of the advice in defining the proper subject matter of the waiver. As with Defendant's submission of the statement to the PTO, Defendant did not rely on the statement to make an argument about the legal merits of Chu's sole *inventorship* status. Defendant did use the statement, however, to put Plaintiff and Meng's notice at issue in this proceeding. Thus, it is only fair that Plaintiff be able to discover documents, regardless of their privileged nature, relating to the subject of notice. Certainly, Defendant should not be permitted to use one attorney-client communication that supports its laches argument while shielding those that may not. Therefore, the Court believes the proper subject matter of the waiver is not inventorship, but Hor and Meng's notice that they were not included on the applications for the patents-in-suit.

### B. Temporal Scope of the Waiver

The parties also dispute the temporal scope implicated by the waiver of attorney-client privilege. Defendant argues that the temporal scope (if any) should be limited to the period between January 1987 and August 1990 when the issue of who would be listed on the application as an inventor was discussed among Cox, Hor, Chu, and Meng. At the opposite extreme, Plaintiff seeks a waiver that extends from the initial meeting of Cox, Chu, Hor, and Meng in 1987 to the present date, arguing that, as in *Windbond*, Defendant has placed inventorship at issue and therefore all communications from 1987 to the present about the subject should be disclosed. Of course, the Court has already determined that the appropriate subject matter of Defendant's waiver is the issue of Plaintiff and Meng's notice, not inventorship. The Court finds that, in fairness, Defendant should not be permitted to shield other attorney-client communications that may contradict the inference raised by Cox's statement – that, in 1987, Plaintiff and

16

Meng knew that Cox, the patent attorney in charge of prosecuting the patents, did not believe they were co-inventors. The Court agrees with Defendant, however, that the proper temporal scope of the waiver extends to communications between UH's counsel and Hor, Chu, and Meng between January 1987 and August 1990 in which the issue of whom would be included as an inventor on the applications for the patent-in-suit was discussed.

## IV.     FAILURE TO PROVIDE ADEQUATE PRIVILEGE LOG

Finally, Plaintiff claims that Chu's Second Amended Privilege Log is insufficient to meet his burden of proving the documents contained therein are privileged. Plaintiff argues that many of the descriptions fail to indicate the date of the document, the persons involved, or its content with sufficient specificity. Since Plaintiff filed his Motion to Compel, Defendant produced a Third Amended Privilege Log on September 20, 2010. Defendant claims that the updated log clarifies some of the document descriptions. In a hearing held on October 7, 2010, Plaintiff stated that he had reviewed the Third Amended Privilege Log and had withdrawn from consideration 17 documents. Plaintiff provided an amended appendix of the documents in the latest privilege log that remain contested.

The Court believes that this Memorandum and Order may further attenuate the disagreement, at least to the extent that it requires further production of documents and clarifies the theory under which other documents can or cannot be shielded by privilege or work product doctrine. Plaintiff may submit a further motion to compel if particular documents remain in dispute.

## V.     CONCLUSION

Considering the circumstances of Defendant's disclosure of Cox's statement, including balancing the prejudice to the parties in this case, the Court finds that the appropriate subject matter of the waiver is Plaintiff and Meng's notice in 1987 that they were not listed as inventors. Defendant's use of the Cox's statement have waived attorney-client communications relating to Plaintiff and Meng's notice that they were not included on the patent applications from the time Cox first met with Chu, Meng, and Hor until the Wu Interference was filed in 1990. Defendant is hereby compelled to produce such documents.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 22nd day of October, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE